UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Donna Doran, et al.**                    Civil No. 07-cv-307
                                           Opinion No. 2009 DNH 032

           **v.**

**Contoocook Valley**
**School District, et al.**

MEMORANDUM AND ORDER

These cross motions for summary judgment concern a school-wide search for illegal drugs that took place at Contoocook Valley Regional High School ("ConVal High") on June 7, 2007. Donna Doran, mother of ConVal High students Kasey and Kerri Doran, and Gary Fischer, father of ConVal High student Silas Fischer, have filed a petition alleging in separate counts that the search violated the students' rights under the Fourth Amendment of the United States Constitution and Part I, Article 19 of the New Hampshire Constitution. Plaintiffs have sued the Contoocook Valley School District, the Contoocook Valley School Board, ConVal High Principal Susan Dell (collectively, "ConVal defendants"), the Town of Peterborough, New Hampshire, and Peterborough Police Chief Scott Guinard. The plaintiffs seek declaratory and injunctive relief, as well as attorneys' fees.

**I.   BACKGROUND**

Plaintiffs' children were all students at ConVal High and were in school on June 7, 2007, when Principal Dell implemented a search of ConVal High's building and grounds.  The essential facts concerning the search are not in dispute.  Where major differences are present in the parties' descriptions of the relevant facts, those differences are noted in the summary that follows.

**A.   The History of Drug Use at ConVal High**

The defendants executed the search on June 7, 2007, because various school and school board officials were concerned that there was a serious drug problem at ConVal High.[1]

In 2005, ConVal High's assistant principal, G. Bruce West, wrote an open letter to the school community and expressed concerns about a drug problem at ConVal High.  (ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at 2.)  In the letter, West details conversations he had with various members of the ConVal High community, and acknowledges the growing perception that the "level of use by our students is undermining our ability to

_____

[1]   The plaintiffs dispute the extent to which the incidents set forth in this subsection constitute a "drug problem."  In setting out the facts as they are presented, the court adopts the phrase "drug problem" for the sake of convenience and clarity.

2

function effectively as an institution."[2]  (Id. at 3.)  Doran
herself acknowledged the drug problem among certain members of
the school population when she wrote to Dell after the June 7,
2007 search, "My kids tell me there is a very big problem and
nothing is being done about it."  (Id.)  She wrote further in a
second email that the "kids tell me there is a lot going on and
they see deals going down all the time."  (Id.)

ConVal High officials distributed a "Youth Risk Behavior
Survey" for the students to fill out in 2005, which was a
"nationally representative survey of high school students
developed by the Centers for Disease Control and Prevention . . .
that compared results in 2003 and 2005."  (Id. at 5.)  The survey
sought to evaluate the extent to which students were using or
experimenting with drugs, alcohol, or tobacco.  The survey showed
that a majority of students were not engaging in "risky
behavior," and revealed that close to seventy percent of the
student respondents had never been offered or given illegal drugs
at ConVal High.  (Pls.' Mot. for Summ. J., Doc. No. 18-2, at 11.)
The survey did show, however, that thirty-two percent of ConVal
High teens reported that "they had been offered, sold, or given

---

[2]   In ruling on these motions, the court does not consider
this statement for the truth of the matter asserted.

3

an illegal drug on school property in the past year . . . [which represents] an increase from 30% in 2003 and is higher than the statewide respondents in both 2003 and 2005 (28% and 27%, respectively)."  (ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at 6.)  The survey also showed that within the month prior to the survey, twenty-eight percent of ConVal High students reported using marijuana.[3]  (Id.)

A Student Assistance Team, made up of Dell, a school crisis counselor, the school nurse, and others, was formed at ConVal High to document student drug use, as well as other medical and educational issues, and support those students needing more serious attention.  (Id.)  According to Dell, the Student Assistance Team's recorded statistics from September 2001 through February 2006 show that "[a]lcohol/Drugs AND academic issues pervade many of the mental health, family based, and discipline issues, but may be secondary to the primary concern."  (Id.)  Dell also states that in the 2006-2007 term, the school's crisis counselor saw thirty-three students (over approximately one hundred and twenty-four visits) for "substance abuse, prevention, intervention and referral," which makes up twenty-percent of the

---

[3]  At the time of this action, ConVal High was made up of approximately 1100 students.  (ConVal Defs.' Answer, Doc. No. 9, at 3.)

4

students he saw that year.  (Id. at 7; see Pls.' Mot. for Summ.
J., Doc. No. 18-2, at 12.)  During the 2005-2006 term, that
number was forty-three (or twenty-six percent of the students the
crisis counselor saw that year), and in the 2004-2005 term, it
was forty-five (or twenty-seven percent of the students he saw
that year). (ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at
7.)

ConVal High officials also record the number of students
suspended for drug-related offenses.  (Pls.' Mot. for Summ. J.,
Doc. No. 18-2, at 11.)  During the 2006-2007 term, fourteen
students were suspended for drug use or possession.  (Id.)
Seventeen students were suspended during the 2005-2006 term, and
twenty-three were suspended during the 2004-2005 term.  (ConVal
Defs.' Mot for Summ. J., Doc. No. 17-2, at 8.)

During the summer recess in 2006, the ConVal School Board
established a Drug and Alcohol Review Committee to examine the
perceived drug problem at the school.  (Id. at 4.)  Various
members of the Committee spoke with people in the ConVal High
community about the use of drugs by students.  Committee members
then shared these conversations at meetings throughout the
summer.  (Id.)

Dell reports that during the 2006-2007 school year, six students spent "extensive time in rehabilitation for drug problems," one student overdosed while at ConVal High and was taken by ambulance to the hospital, and the ConVal High nurse "conducted health evaluations on between 15 to 18 students who were suspected of being under the influence of drugs."  (<u>Id.</u> at 8-9.)  Dell also states that she received phone calls from anonymous sources alleging that several students were engaged in the dealing of drugs.  When one suspect was searched, school officials discovered $2,700 in his possession.  (<u>Id.</u> at 8.)

The ConVal defendants agreed that there was a drug problem at the school, and "reviewed and revised" the school's drug and alcohol policies in an effort to get the situation under control.  (<u>Id.</u> at 9.)  In order to "set a tone for next year that their policy is zero tolerance for drugs," the ConVal School Department and Dell determined that the use of drug sniffing dogs would be an appropriate means by which to address their concerns.  (<u>Id.</u> at 10.)

**B.    <u>Preparations for the Drug Search</u>**

Throughout the summer and into the fall of 2006, the ConVal defendants discussed, on various occasions, the possibility of bringing police dogs into ConVal High.  (Pls.' Mot. for Summ. J.,

Doc. No. 18-2, at 8-9.)  Dell first reached out to Chief Guinard
in December 2006 about the plan for a canine search.  The ConVal
School Board chairman, Thomas Welden, later emailed what
plaintiffs call a "directive" instructing Dell to make a formal
request.  (Id. at 9.)  Dell subsequently sent a letter to Guinard
formally requesting the police dogs for some time between May 29
through June 15, 2007, which was forwarded to the New Hampshire
State Police.  (Id.)  It was agreed that ConVal High officials
would respond to whatever the search uncovered and that there
would be no police investigation or criminal prosecution.
(ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at 10;
Peterborough Defs.' Mot. for Summ. J., Doc. No. 19-2, at 5.)

    The scope of the search was left to Dell, though Guinard
explained the procedures governing how the police officers would
conduct a search using the dog.  (ConVal Defs.' Mot. for Summ.
J., Doc. No. 17-2, at 11; Pls.' Mot. for Summ. J., Doc. No. 18-2,
at 10.)  When, at first, she expected to only have one police dog
on hand, Dell decided that the students in one wing of the
building at a time would go to the theater while their rooms were
searched.  (ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at
11.)  The initial plan also included a search of the gymnasium
and a wooded area, which Dell claims is known informally as the

"Pot Den."  (Id.)

The search plan was altered, however, when Dell learned that several police dogs would be used in the search.  A decision was made to empty the school during the search because, with multiple police dogs at work, it would be impossible to move students simultaneously while conducting the search.  (Id. at 12.)  The plan involved emptying the school without the use of the intercom system, which the ConVal defendants said had the added benefit of providing "an opportunity to practice informing students and staff about an emergency in the event that the intercom system could not be used when . . . a weapon or shooter was in the building."[4]  (Id.)  The length of the search was unknown at the time of preparation, but Dell determined that it would count towards the ten drills that ConVal High was required to have during the school year.  (Id. at 13.)  Dell maintains that the drills generally last between thirty and forty-five minutes; however, she notes that on certain occasions in the past, such as during a bomb threat evacuation in 2006, the building was emptied for approximately seventy-five minutes while the students stood

_____

[4]  Plaintiffs point out that the usual procedures for responding to "gun fire" and "intruder" incidents involve a "shelter in place" approach wherein students remain in the classroom.  (Pls.' Resp., Doc. No. 22-2, at 4.)

outside in cold, inclement weather.  (Id.)  During drills, Dell

states that the students are sent to either the parking lot or

football field, and in some cases, transported to another school.

When the school is emptied, ConVal High staff "must keep track of

the students for safety reasons and must ensure that students do

not leave the campus."  (Id.)

The ConVal School District's stated policy governing

searches demands "reasonable suspicion" to search a student's

personal items.  (Pls.' Mot. for Summ. J., Doc. No. 18-2, at 7.)

The policy also requires the school official to identify the

suspected conduct that justifies the search, ascertain the source

of the information, and then assess the reliability of that

source.  Moreover, the student handbook limits non-consensual

searches of a student's property to those instances where the

administration "has reasonable grounds to believe the search will

turn up evidence that the student has violated or is violating

the law or rules of the school."  (Id. at 8.)

C.    **The June 7, 2007 Drug Search**

1.    *The School Is Emptied*

On June 7, 2007, at approximately 9:00 a.m., Dell sent a

statement for instructors to read to the students in each of the

classrooms.  The statement informed students that the school was

conducting a drill without the use of the intercom system.  It told students to take the usual evacuation path out of the building and then to proceed to the football field.  Students were also instructed not to take anything with them.  Staff were told not to inform the students of the nature of the drill, and any student who did not want to leave his or her belongings behind was taken, with those personal belongings, to the main office.  (ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at 14; Pls.' Mot. for Summ. J., Doc. No. 18-2, at 3.)  The atypical procedures left certain students, including plaintiffs' children, feeling "anxious and nervous."  (Pls.' Mot. for Summ. J., Doc. No. 18-2, at 3.)

Once on the football field, students were instructed to remain inside the track, and staff members, including the school nurse and her assistant, were on hand to maintain order and oversight. The students were not free to leave the track, though they were escorted by staff to the bathroom facilities as needed. While on the field, the students were not given food, water, or sunscreen, and some students, though none represented in this case, suffered sunburns.  (Id. at 3-4.)

Kasey Doran, daughter of one of the plaintiffs, was in chorus class at the time of the drill.  When she asked what was

going on, the instructor told her that he was unsure and that she
had to leave her purse behind.  The purse contained her cellular
phone, portable music player, money, and personal hygiene
products.  (Id. at 5.)  Kasey was in a full leg cast, and when
she arrived at the field, she had to sit on the ground because
there was no more space in the bleachers.  She felt trapped,
because it appeared that the gates surrounding the field were
locked.  (Id.)

Kerri Doran, the other daughter of plaintiff Donna Doran,
was in English class when she was told to leave the room for the
drill.  She, too, left behind her purse as instructed, and thus
left the purse's contents – cellular phone, money, and  personal
hygiene products – behind as well. (Id. at 6.)  Kerri felt
crowded on the field, and when she moved towards the gates at one
point because she thought the students were being let back into
the building, she was rebuffed and told she could not leave.
(Id.)

Silas Fischer, son of plaintiff Gary Fischer, was in Applied
Technology class during the drill and was told that he could not
bring his jacket with him.  (Id.)  While exiting the building, he
saw staff members seizing a camera from one student and purses
from others.  Silas was on the football field during his lunch

period, but when he asked if he could eat some of the food he had

in his pocket, his request was denied.  Upon seeing one teacher

chase down a student who attempted to flee to his car, Silas did

not feel "free to leave or to act independently," especially with

all of the school officials patrolling the area.  (Id. at 7.)

### 2.   *The Police Dog Search*

With the students gathered on the football field, three

officers from the Peterborough Police Department and two troopers

from the New Hampshire State Police arrived at ConVal High to

begin the search.  The troopers had two police dogs with them.

Guinard was also present to introduce the school officials to the

troopers; however, he insists that he had no role in executing

(or planning to execute) the dog search.  (Peterborough Defs.'

Mot. for Summ. J., Doc. No. 19-2, at 6.)  Once the search was

underway, Guinard returned to the police station.  Dell began the

search in the school gymnasium and continued to move through the

school.  The dogs and their handlers walked in front of the

uniformed officers and school administrators, and the dogs then

proceeded to sniff the students' belongings.  In the eight

instances in which dogs alerted, a Peterborough police officer

marked the bag, and ConVal High administrators decided whether or

not they would search it.  (ConVal Defs.' Mot. for Summ. J., Doc.

No. 17-2, at 15.)

Approximately ninety minutes after having exited the building, the students were permitted to return.  Much to the surprise of Guinard, no illegal substances were found.  (Id.)  Some of the students noted that their belongings had been moved.  Silas Fischer discovered that his bag was not where he had left it.  He found it in an administrative office, piled with other bags, with the zipper pocket opened.  (Pls.' Mot. for Summ. J., Doc. No. 18-2, at 7.)

## II.   **STANDARD OF REVIEW**

Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment must first identify the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95

F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### IV.   ANALYSIS

Plaintiffs argue that their children were the victims of an illegal dog search of their belongings.  They also argue that they were illegally seized when they were forced out of ConVal High and required to assemble on the football field.  They allege that this course of conduct violated the students' rights under both the United States Constitution and the New Hampshire Constitution.  The parties' arguments with respect to each of these sources of law are addressed in the pages that follow.

### A.   Claims Under the United States Constitution

Plaintiffs' federal constitutional claims are brought pursuant to 18 U.S.C. § 1983, which imposes civil liability "upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." Shuman v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005).  The thrust of the plaintiffs' federal claims is that the defendants violated their children's rights guaranteed by the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to

14

be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures . . . ."  U.S. CONST. amend.
IV.  The United States Supreme Court has held that this
protection is applicable to searches and seizures conducted by
state actors, including public school officials, via the
Fourteenth Amendment.  Vernonia Sch. Dist. v. Acton, 515 U.S.
646, 652 (1995); New Jersey v. T.L.O., 469 U.S. 325, 336-37
(1985).  Reasonableness is the touchstone in any assessment of
the constitutionality of a search or seizure, and while, in most
cases, reasonableness demands a warrant and a showing of probable
cause, such is not necessarily the case in the public school
context.  Bd. of Educ. of Indep. Sch. Dist. v. Earls, 536 U.S.
822, 828-29 (2002).  In the public school setting, the
constitutionality of a search of a student "depends simply on the
reasonableness, under all the circumstances, of the search."
T.L.O., 469 U.S. at 341.  In considering the policy motivations
behind the Supreme Court's holding in T.L.O., as well as the
"unique responsibilities public schools bear," other courts have
applied this same reasonableness standard to seizures that take
place in the public school context.  Shuman, 422 F.3d at 148;
Edwards v. Rees, 883 F.2d 882, 884 (10th Cir. 1989); see also
United States v. Ferrara, 771 F. Supp. 1266, 1290 (D. Mass. 1991)

(broadly interpreting T.L.O. to stand for the proposition that searches *and* seizures in public schools can be conducted without warrant or probable cause).

Although it is undisputed that students "assuredly do not 'shed their constitutional rights . . . at the schoolhouse gate,' the nature of those rights is what is appropriate for children in school." Vernonia Sch. Dist., 515 U.S. at 655-56 (internal citations omitted). A student's rights must be considered in the context of the reality he faces: compulsory attendance and restrictions on movement and location "subject to the ordering and direction of teachers and administrators." Shuman, 422 F.3d at 149. This understanding of context is essential to a proper determination of reasonableness. T.L.O., 469 U.S. at 337. The court, therefore, must carefully balance the students' important constitutional rights with the school officials' "duty to provide a safe environment conducive to education . . . [and] duty to protect [the students] from dangers posed by antisocial activities – their own and those of other students." Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470, 480 (5th Cir. 1982); see Earls, 536 U.S. at 830 (noting the required balancing of a student's Fourth Amendment rights against "the promotion of legitimate governmental interests").

Plaintiffs challenge both the alleged search and seizure that took place on June 7 at ConVal High.  Thus, for purposes of clarity, I will examine the search and seizure separately.

### 1.   *There Was No Search in Violation of the United States Constitution*

The first issue is whether a search implicating the Fourth Amendment occurred when the defendants used drug dogs to sniff the school grounds and personal property of students at ConVal High.[5]  Fischer asserts that his belongings were moved; however, he does not contend that they were searched by either police or school officials.  Thus, Doran and Fisher's legal challenges are appropriately limited to the use of drug detection dogs on school grounds to sniff the students' personal property.

Courts across this country have taken up the issue of drug detection dog sniffs in a variety of circumstances.  The existing precedents, those binding on this court and those merely persuasive, leave little doubt that the mere use of trained drug dogs on school grounds to sniff students' personal items does not qualify as a search within the meaning of the Fourth Amendment.

---

[5]  None of the litigants in this case allege that their personal property was searched in any way other than by a dog sniff, and so they lack standing to challenge any of the specific searches of personal belongings conducted by school officials after the dogs alerted.

When confronted with cases involving dog sniffs for illegal drugs in other contexts, the United States Supreme Court has repeatedly concluded that the Fourth Amendment is not implicated by such searches.  See, e.g., Illinois v. Caballes, 543 U.S. 405, 409 (2005) ("[T]he use of a well-trained narcotics-detection canine – one that 'does not expose noncontraband items that otherwise would remain hidden from public view,' during a lawful traffic stop, generally does not implicate legitimate privacy interests . . . Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." (internal citations omitted)); City of Indianapolis v. Edmond, 531 U.S. 32, 40 (2000) ("It is well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment . . . a sniff by a dog that simply walks around a car is 'much less intrusive than a typical search.'"); United States v. Place, 462 U.S. 696, 707 ("[W]e conclude that the particular course of investigation that the agents intended to pursue here – exposure of respondent's luggage, which was located in a public place, to a trained canine – did not constitute a 'search' within the meaning of the Fourth Amendment.").

Similarly, in United States v. Esquilin, the U.S. Court of Appeals for the First Circuit held that a canine sniff of a hotel room – wherein the canine sniffed furniture and a retail clothing

18

bag – was not a search.  208 F.3d 315, 318 (1st Cir. 2000).   In
applying the holding of United States v. Place, the First Circuit
noted that the essential factor in the analysis is whether "the
observing person or the sniffing canine are legally present at
their vantage when their respective senses are aroused by
obviously incriminating evidence."  Id. (quoting United States v.
Reed, 141 F.3d 644, 649 (6th Cir. 1998)).   Other courts of
appeals have followed suit.  See, e.g.,  United States v. Hayes,
551 F.3d 138, 145 (2d Cir. 2008) ("[D]efendant has no legitimate
expectation of privacy in the front yard of his home insofar as
the presence of the scent of narcotics in the air was capable of
being sniffed by the police canine."); Reed, 141 F.3d at 649
("[T]he limiting and discriminating nature of a sniff does 'not
constitute a search within the meaning of the Fourth
Amendment.'"); Jennings v. Joshua Indep. Sch. Dist., 877 F.2d
313, 316 (5th Cir. 1989) ("The use of trained canines to sniff
automobiles parked on public parking lots does not constitute a
search within the meaning of the fourth amendment."); Horton, 690
F.2d at 477 (dog sniff of school lockers not a search under the
Fourth Amendment).

The same principles guiding the courts' decisions that
canine sniffs of school lockers, cars, and luggage are not
searches within the meaning of the Fourth Amendment apply to the
sniffs of students' personal belongings as well.  A canine sniff

19

of personal belongings "does not expose noncontraband items that otherwise would remain hidden from public view."  Place, 462 U.S. at 707; see Horton, 690 F.2d at 477.  It is less intrusive than the typical search because it does not require an officer to rummage through one's bags. See Doe v. Little Rock Sch. Dist., 380 F.3d 349, 355 ("Full-scale searches that involve people rummaging through personal belongings concealed within a container are manifestly more intrusive than searches effected by using metal detectors or dogs."). Moreover, a canine sniff only identifies the presence or absence of narcotics, and this limited disclosure ensures "that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." Place, 462 U.S. at 707.  Of course, sniffs of one's person raise an entirely distinct – and more problematic – set of issues.  See B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1267 (9th Cir. 1999) (noting that because "the body and its odors are highly personal," canine sniffs of one's person are "highly intrusive"). The facts at issue here, however, do not require the court to wade into these troubled waters, because canine sniffs of property implicate none of those concerns.  Plaintiff's students

were not illegally searched in violation of their Fourth
Amendment rights.[6]

### 2. Holding the Students on the Football Field Did Not Amount to a Seizure in Violation of the United States Constitution

Plaintiffs also allege that forcing their children to remain
on the ConVal High football field while the police dogs moved
through the school amounted to an unconstitutional seizure.  The
traditional understanding of what constitutes a seizure – that "a
reasonable person would have believed that he was not free to
leave," Shuman, 422 F.3d at 147 (quoting Michigan v. Chesternut,
486 U.S. 567, 573 (1988)) – is analytically inapplicable to the
school setting, because "students are generally not at liberty to
leave the school building when they wish," Couture v. Bd. Of
Educ. of Albuquerque Pub. Schs., 535 F.3d 1243, 1250-51 (10th
Cir. 2008); see Vernonia Sch. Dist., 515 U.S. at 654
("unemancipated minors lack some of the most fundamental rights
of self-determination – including even the right to come and go
at will").  Thus, in the school setting, to qualify as a seizure
under the Fourth Amendment, "the limitation on the student's

---

[6]  My ruling on this point should not be construed as an
endorsement of the ConVal defendants' decision to use drug dogs
to sniff the students' belongings. Reasonable people can argue
that any drug problem at the school could have been addressed
through other, less intrusive, interdiction methods.  Instead, I
merely hold that the use of drug dogs in this case does not
qualify as a search under the Fourth Amendment.

freedom of movement must significantly exceed that inherent in every-day, compulsory attendance." Couture, 535 F.3d at 1251.

Here, however, there was no seizure. Briefly restricting a student's movement so as to facilitate a dog sniff is not the type of limitation that constitutes a seizure in violation of the Fourth Amendment. Plumas Unified Sch. Dist., 192 F.3d at 1269 (confining students to a designated area "for five to ten minutes during an unquestionably legitimate dog sniff of the students' classroom is not a seizure within the meaning of the Fourth Amendment"). In Doe v. Renfrow, a student was instructed to remain in her first period class ninety-five minutes longer than usual while a canine sniff was conducted. 475 F. Supp. 1012, 1018-19 (N.D. Ind. 1979). The district court held that "[s]uch a regulation of a student's movement in no way denies that person any constitutionally guaranteed right." Renfrow, 475 F. Supp. at 1019, aff'd in part, rev'd in part, 631 F.2d 91 (7th Cir. 1980). In reaching this conclusion, the court noted that an extended first period was often employed on days when the school held assemblies and other convocations. Id. Similarly, students at ConVal High are evacuated from the building and corralled outside with some frequency: ten times a year, for required drills, they are confined to either the football field or parking lot and not

permitted to leave.[7]  (ConVal Defs.' Mot. For Summ. J., Doc. No. 17-2, at 22.)  On June 7, 2007, a similar evacuation took place, and although it was not for an emergency drill, it was for an entirely lawful purpose.

It is also worth noting that this exercise was not conducted in a stigmatizing manner.  No one student, or group of students, was alone the target of a dog's nose.  See Earls, 536 U.S. at 837 ("A program of individualized suspicion might unfairly target members of unpopular groups.").  As for the decision to detain the students on the football field while the search was conducted, this too, was a judgment sensitive to the students' privacy interests, as it avoided the possibility that one of the dogs could have sniffed a student's person.  See Horton, 690 F.2d at 478 (noting that the Fourth Amendment "applies with its fullest vigor against any intrusion on the human body").  In sum, relocating the students to the football field, where they remained under constant adult supervision, allowed the defendants to conduct the search in a way that was both efficient and minimally intrusive.[8]

---

[7]  The June 7 drill was longer than the usual drills, but Dell maintains that the students only missed one "block" of school time, which she claims is not uncommon for drills. (ConVal Defs.' Mot. for Summ. J., Doc. No. 17-2, at 22.)

[8] Plaintiffs complain that some of the other students suffered sunburns while they were held on the football field. One cannot reasonably infer from this, however, that the circumstances of their detention were physically abusive.  I take

23

Finally, plaintiffs complain that Dell's orders instructing the students to leave their personal belongings inside the building resulted in an improper seizure.  I am unpersuaded by plaintiffs' argument.  Again, the school setting is crucial to the analysis.  See Vernonia Sch. Dist., 515 U.S. at 655-56. Students are often restricted in what items they can bring to school and where they can leave those items.  Accordingly, I reject plaintiffs' contention that their children were seized in violation of their Fourth Amendment rights.

**B.   Claims Arising Under the New Hampshire Constitution Should Be Remanded to State Court Pursuant to 1367(c)**

Having dismissed plaintiffs' federal constitutional challenges, the only remaining count is a claim based on the New Hampshire Constitution.  Accordingly, the court's jurisdiction is based on supplemental jurisdiction, and thus, the decision to address Count 2 is wholly within the court's discretion.  See Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995).

---

notice of the fact that the high temperature for June 7, 2007, in Concord, New Hampshire, was seventy-one degrees Fahrenheit. National Climate and Data Center, http://cdo.ncdc.noaa.gov/gclcd/QCLCD (last visited Mar. 10, 2009); see United States v. Foreman, 369 F.3d 776, 786 (4th Cir. 2004) (courts can take judicial notice of weather). It is highly unlikely that the temperature was significantly higher in Peterborough.  Moreover, it hardly seems plausible that the students were traumatized by a free period spent outside with their classmates on a nice day.

Based on State v. Pellicci, 133 N.H. 523 (1990), and In re Juvenile 2006-406, 156 N.H. 233 (2007), plaintiffs argue that the New Hampshire Constitution is more protective than the United States Constitution with respect to searches and seizures. Plaintiffs deserve a full and fair hearing on this issue, and because the state court is better equipped to interpret the distinctive contours of the state constitution's analog to the Fourth Amendment of the United States Constitution, this court, pursuant to its authority under 18 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the remaining state law claim.  Instead, the case shall be remanded to state court where it was originally filed.

## VI.  CONCLUSION

Plaintiffs motion for summary judgment (Doc. No. 18) is denied with respect to Count 1.  The court declines to exercise supplemental jurisdiction over Count 2, and orders that Count 2 be remanded to state court for resolution.  Defendants' motions for summary judgment (Doc. Nos. 17, 19) are granted with respect to Count 1.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

March 25, 2009

25

```
cc:  Christopher Cole, Esq.
     Robert Derosier, Esq.
     Diane Gorrow, Esq.
     Barbara Ruth Keshen, Esq.
     Karyl Roberts Martin, Esq.
```